David L. Barrack
James Nespole
Jami Mills Vibbert
David B. Schwartz
FULBRIGHT & JAWORSKI LLP
666 Fifth Avenue
New York, NY 10103
Tel.: (212) 318-3000
Fax: (212) 318-3400
david.barrack@nortonrosefulbright.com
james.nespole@nortonrosefulbright.com
jami.vibbert@nortonrosefulbright.com
david.schwartz@nortonrosefulbright.com

**14 CV 3034**

*Attorneys for Plaintiffs CBF Indústria de Gusa S/A, Da Terra Siderúrgica LTDA, Fergumar –
Ferro Gusa do Maranhão LTDA, Ferguminas Siderúrgica LTDA, Gusa Nordeste S/A, Sidepar –
Siderúrgica do Pará S/A, and Siderúrgica União S/A*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

CBF INDÚSTRIA DE GUSA S/A, DA    :
TERRA SIDERÚRGICA LTDA,    :
FERGUMAR – FERRO GUSA DO    :
MARANHÃO LTDA, FERGUMINAS    :
SIDERÚRGICA LTDA, GUSA NORDESTE    :
S/A, SIDEPAR – SIDERÚRGICA DO    :
PARÁ S/A, and SIDERÚRGICA UNIÃO    :
S/A,    :
    :
    :
    Plaintiffs,    :    Civil Action No.:
v.    :
    :    **COMPLAINT**
STEEL BASE TRADE AG, AMCI    :
HOLDINGS, INC., AMERICAN METALS    :
& COAL INTERNATIONAL, INC., K-M    :
INVESTMENT CORPORATION, PRIME    :
CARBON GMBH, PRIMETRADE, INC.,    :
HANS MENDE, and FRITZ KUNDRUN,    :
    :
    Defendants.    :

-------------------------------------------------------x

Plaintiffs CBF Indústria de Gusa S/A ("CBF"), Da Terra Siderúrgica LTDA ("Da

Terra"), Fergumar – Ferro Gusa do Maranhão LTDA ("Fergumar"), Ferguminas Siderúrgica

LTDA ("Ferguminas"), Gusa Nordeste S/A ("Gusa"), Sidepar – Siderúrgica do Pará S/A ("Sidepar"), and Siderúrgica União S/A ("Sideúrgica") (collectively, "Plaintiffs"), by and through their undersigned attorneys, allege as follows:

## NATURE OF THE ACTION

1.     This is an action to confirm an International Chamber of Commerce Paris ("ICC Paris") arbitration award ("Award") in excess of $48 million in favor of Plaintiffs against Defendant Steel Base Trade AG ("SBT").  This Court has personal jurisdiction over SBT through its alter egos, Hans Mende ("Mende") and Fritz Kundrun ("Kundrun") (Mende and Kundrun, collectively, the "Individual Alter Egos"), in their individual capacities and through their control and ownership of SBT, AMCI Holdings, Inc. ("AMCI Holdings"), American Metals & Coal International, Inc. ("AMCI"), K-M Investment Corporation ("K-M"), Prime Carbon GmbH ("Prime Carbon"), and Primetrade, Inc. ("Primetrade USA") (AMCI Holdings, AMCI, K-M, Prime Carbon, and Primetade USA, collectively, the "Corporate Alter Egos").

2.     Plaintiffs comprise a group of seven Brazilian pig iron producers.  From January to September 2008, Plaintiffs agreed, in ten separate contracts, to sell 103,500 metric tons of pig iron to SBT for total consideration to Plaintiffs of over $76 million (the "Contracts").  SBT purchased a portion of the pig iron under the Contracts, but when the price of pig iron fell in the open market in the Fall of 2008, SBT, in violation of the Contracts, discontinued its purchases with in excess of $42 million remaining due to Plaintiffs.  After due demand, SBT did not perform the Contracts and instead purchased pig iron from other suppliers at lower prices. Plaintiffs submitted the dispute to arbitration in the ICC Paris as provided for in the Contracts.

3.     To avoid paying certain creditors of SBT, which included Plaintiffs, owed $48 million, and another creditor, owed in excess of $4.5 million, prior to and during the pendency of

the ICC Paris arbitration, Mende and Kundrun, individually and through their control and domination of SBT and the Corporate Alter Egos, formulated a scheme to transfer the business and assets of SBT to Prime Carbon. While the arbitration was proceeding, SBT requested additional time to answer and opposed injunctive relief in the arbitration to prevent the transfer of SBT's assets. With respect to each, SBT, ultimately controlled by its alter egos Mende and Kundrun, made misrepresentations to Plaintiffs that they intended to honor their Contracts and to the arbitration panel about their need to evaluate their position while they were in the process of rendering SBT insolvent and unable to pay its obligations to a select group of its creditors. SBT, ultimately controlled by its alter egos Mende and Kundrun, transferred the business of SBT to Prime Carbon in a turn-key operation and would continue to reap the benefits of the revenue generated by SBT's primary asset, a U.S. subsidiary, Primetrade USA. Mende and Kundrun, through the Corporate Alter Egos, then transferred Primetrade USA from Prime Carbon, SBT's successor and alter ego, to AMCI Holdings, another Mende-and-Kundrun-dominated enterprise, but one based in the United States.

4.  SBT was ultimately owned and controlled by Mende and Kundrun. Prime Carbon is ultimately owned and controlled by Mende and Kundrun. AMCI Holdings is directly owned by Mende and Kundrun. Following the transfer of SBT's business to Prime Carbon, Prime Carbon was initially located at the same address as SBT and then at the same address as SBT's parent company and had many of the same officers and directors as SBT. Prime Carbon sent letters to certain of SBT's contract parties advising that it was assuming all of SBT's contracts. Prime Carbon assumed all of SBT's secured debt and bank lines so that it could continue purchasing commodities. Once Mende, Kundrun, and the Corporate Alter Egos looted SBT of

its assets, they waited four months and then caused SBT to file for bankruptcy with only €7,000 left in its accounts.

5.      On November 9, 2011, the arbitral tribunal rendered the final Award against SBT in favor of Plaintiffs in the amount of $48,053,462.12.  SBT was without funds to pay it.

6.      Prior to the transfer of SBT's assets to Prime Carbon for $1, SBT had assets valued at approximately $126 million and liabilities of $130 million.  If SBT had been liquidated at the time of the arbitration award, creditors of SBT, including Plaintiffs, would have recovered a nearly 48% distribution (over $23 million for Plaintiffs).  Instead, Mende and Kundrun implemented a fraudulent plan to transfer all of SBT's assets and most, but not all, of the liabilities to a Mende-and-Kundrun-owned shell company, Prime Carbon.

7.      When asked by a representative of two of the Plaintiffs why SBT would so cavalierly avoid their obligations under the Contracts, an SBT representative relayed a comment by Mende: "A naked man has no pockets."

8.      Pursuant to the New York Convention (defined herein) and 9 U.S.C. § 207, Plaintiffs are entitled to confirm the Award against SBT, a party subject to this Court's jurisdiction through its alter egos.

## PARTIES

9.      Plaintiff CBF Indústria de Gusa S/A ("CBF") is a foreign company organized and existing under the laws of Brazil, with its registered offices at Rod. BR101 S/N, Km 196.5, Zona Rural, 29680-000, João Neiva, Espírito Santo, Brazil, and Av. Afonso Pena 4100, 10º andar, Cruzeiro, 30130-009, Belo Horizonte, Minas Gerais, Brazil.

10.     Plaintiff Da Terra Siderúrgica LTDA ("Da Terra") is a foreign company organized and existing under the laws of Brazil, with its registered office at Rod. PA 150, Km 422, Lote 4, Quadra A, Dist. Industrial, 68500-000, Marabá, Pará, Brazil.

11.     Plaintiff Fergumar – Ferro Gusa do Maranhão LTDA ("Fergumar") is a foreign company organized and existing under the laws of Brazil, with its registered office at Rua da Bahia 1.900, 7º andar, Lourdes, 30130-011, Belo Horizonte, Minas Gerais, Brazil.

12.     Plaintiff Ferguminas Siderúrgica LTDA ("Ferguminas") is a foreign company organized and existing under the laws of Brazil, with its registered office at Rua da Bahia 1.900, 7º andar, Lourdes, 30130-011, Belo Horizonte, Minas Gerais, Brazil.

13.     Plaintiff Gusa Nordeste S/A ("Gusa") is a foreign company organized and existing under the laws of Brazil, with its registered offices at Rod. BR 222, Km 14.5 S/N, 65930-000, Açailandia, Maranhão, Brazil, and Av. Afonso Pena 4100, 10º andar, Cruzeiro, 30130-009, Belo Horizonte, Minas Gerais, Brazil.

14.     Plaintiff Sidepar – Siderúrgica do Pará S/A ("Sidepar") is a foreign company organized and existing under the laws of Brazil, with its registered office at Rua Peru 75, Sion, 30320-040, Belo Horizonte, Minas Gerais, Brazil.

15.     Plaintiff Siderúrgica União S/A ("Siderúrgica") is a foreign company organized and existing under the laws of Brazil, with its registered office at Rua Peru 75, Sion, 30320-040, Belo Horizonte, Minas Gerais, Brazil.

16.     Defendant Steel Base Trade AG ("SBT") was a private foreign company located at Bahnhof-Park 2, 6340 Baar, Switzerland.  Prior to its liquidation, Mende and Kundrun ultimately controlled and owned SBT.  Mende and Kundrun used the corporate form as a shield

to commit fraud and leave SBT without assets to pay its debts.  SBT has been removed from the corporate registry in Switzerland and no longer exists.

17.  AMCI Holdings, Inc., ("AMCI Holdings") is a corporation organized under the laws of the State of Delaware with its registered office located at 1105 North Market Street, Suite 1300, Wilmington, Delaware 19890.  Upon information and belief, Mende and Kundrun each beneficially own fifty percent of the issued and outstanding shares of capital stock of AMCI Holdings.  Mende is the President and a Director of AMCI Holdings and Kundrun is a Director of AMCI Holdings.

18.  Primetrade, Inc., ("Primetrade USA") is a corporation organized under the laws of the State of Delaware with its principal place of business located at 11301 Carmel Commons Boulevard, Charlotte, North Carolina 28226.  Primetrade USA is owned by AMCI Holdings. Mende and Kundrun ultimately control and own Primetrade USA.

19.  K-M Investment Corporation ("K-M") is a corporation organized under the laws of the State of Connecticut with its registered office located at 475 Steamboat Road, Second Floor, Greenwich, Connecticut 06830.  K-M is owned by AMCI Holdings.  Mende is the President of K-M and Kundrun is the Chief Executive Officer of K-M.  Mende and Kundrun ultimately control and own K-M.

20.  American Metals & Coal International, Inc., ("AMCI") is a corporation organized under the laws of the State of Delaware with its principal place of business located at 475 Steamboat Road, Second Floor, Greenwich, Connecticut 06830.  AMCI is owned by K-M. Mende is the President of AMCI and Kundrun is the Chairman of the Board of Directors of AMCI.  Mende and Kundrun ultimately control and own AMCI.

21.     Prime Carbon GmbH ("Prime Carbon"), formerly Prime Carbon AG, is a private foreign company organized and existing under the laws of Switzerland with its registered office located at Seestrasse 17, 6300 Zug, Switzerland, formerly of Bahnhof Park 2, 6340 Baar, Switzerland. Mende was the President of the Board of Directors of Prime Carbon; he is now the President of the Management of Prime Carbon. Mende and Kundrun ultimately control and own Prime Carbon.

22.     Hans Mende, upon information and belief, is a resident of the State of New York. Upon information and belief, Mende maintains a residence at 351 East 51st Street, #11B, New York, New York 10022. Mende, along with Kundrun, is the alter ego of SBT and the Corporate Alter Egos.

23.     Fritz Kundrun, upon information and belief, is a resident of the State of New York. Upon information and belief, Kundrun paid 2012 taxes on several properties in New York, including 106 Tripp Street, Mount Kisco, New York 10549; 102 Tripp Street, Mount Kisco, New York 10549; and Roseholm Place, Mount Kisco, New York 10549. While these properties were purchased by Kundrun, they were each transferred, on October 29, 2002, to the Eva Rosen Trust. Upon information and belief, Kundrun resides at 106 Tripp Street, Mount Kisco, New York 10549. Kundrun, along with Mende, is the alter ego of SBT and the Corporate Alter Egos.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action pursuant to 9 U.S.C. § 203 and 28 U.S.C. § 1331.

25.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

A.      **Personal Jurisdiction over Mende and Kundrun**

26.      Upon information and belief, Mende and Kundrun are resident and/or doing business in this District, and Defendant SBT and the Corporate Alter Egos are alter egos of Mende and Kundrun and therefore resident and doing business in this District.

B.      **Alter Ego Jurisdiction over SBT and the Corporate Alter Egos**

27.      Mende, Kundrun, Primetrade USA, and Prime Carbon are the alter egos of SBT.

28.      Throughout the relevant time period, Mende and Kundrun dominated and controlled the affairs of SBT such that Mende and Kundrun are the alter egos of SBT.

29.      Alternatively, throughout the relevant time period, Primetrade USA dominated and controlled the affairs of SBT such that Primetrade USA is the alter ego of SBT. Mende and Kundrun dominated and controlled the affairs of Primetrade USA such that Mende and Kundrun are the alter ego of Primetrade USA, and therefore the alter ego of SBT.

30.      Alternatively, Prime Carbon dominated and controlled the affairs of SBT such that Prime Carbon is the alter ego of SBT. Mende and Kundrun dominated and controlled the affairs of Prime Carbon such that Mende and Kundrun are the alter ego of Prime Carbon, and therefore the alter ego of SBT.

31.      SBT did not have regular, required meetings under Swiss law and did not observe corporate formalities.

32.      SBT was not adequately capitalized.

33.      Upon information and belief, SBT's alter egos removed assets out of SBT for personal and not corporate use.

34.      Mende and Kundrun are the ultimate owners of SBT, Primetrade USA, and Prime Carbon. SBT was owned by AMCI International, which was owned by AMCI Euro-Holdings

B.V., Netherlands, which is owned by AMCI Worldwide Holdings S.à.r.l., which is owned by AMCI Worldwide, whose ultimate owners/beneficiaries are Mende and Kundrun.  Primetrade USA is owned by AMCI Holdings, whose ultimate owners/beneficiaries are Mende and Kundrun.  Prime Carbon is owned by AMCI Euro-Holdings B.V., Netherlands, which is owned by AMCI Worldwide Holdings S.à.r.l., which is owned by AMCI Worldwide, whose ultimate owners/beneficiaries are Mende and Kundrun.

35.     SBT intermingled its assets with the assets of its alter egos.

36.     In addition, Mende and Kundrun are the alter egos of AMCI Holdings, K-M, and AMCI.  Mende and Kundrun ultimately control and own AMCI Holdings, K-M, and AMCI.  AMCI Holdings, K-M, and AMCI intermingled their assets with the assets of their alter egos.

## BACKGROUND FACTS

### A.     Plaintiffs' Contracts with SBT

37.     Plaintiffs produce and supply pig iron, an intermediate metal made by smelting iron ore with a high-carbon fuel.  Pig iron can be further refined through melting and blending processes into steel or wrought iron.  The pig iron market is limited, with only a small number of producers, many of which are in Brazil.

38.     Beginning over fifteen years ago, Plaintiffs began selling pig iron to Primetrade AG (a Swiss company), the predecessor to SBT.  Over the span of their relationship, Plaintiffs sold to Primetrade AG (or its successor) hundreds of millions of dollars of pig iron.

39.     Primetrade AG had an office in Brazil.  Plaintiffs regularly dealt with Primetrade AG's representative in Brazil, Silvio Moreira ("Moreira").

40.     Primetrade AG had a subsidiary in the United States, Primetrade USA. A portion of the pig iron sold to Primetrade AG was supplied to Primetrade USA. Primetrade AG and Primetrade USA operated as one company.

41.     On or about February 28, 2004, off the coast of Colombia, a bulk carrier, the YTHAN, exploded, causing the death of the master and five crew members of the vessel. The YTHAN cargo was being supplied for the benefit of Primetrade AG.

42.     Following the loss of life and cargo on the YTHAN, on or about April 6, 2005, Primetrade AG transferred its business to SBT. SBT began operating with the same officers and directors as Primetrade AG and at the same offices. Moreira informed a representative of Plaintiffs CBF and Gusa that Primetrade AG had to change its name due to its inability to obtain financing and otherwise continue its business following litigation concerning the vessel explosion. Moreira assured Plaintiffs that the business would be the same, just under a different name. Plaintiffs and SBT continued to contract for the sale of pig iron.

43.     On or about October 5, 2007, AMCI International GmbH ("AMCI International"), a company owned and controlled by Mende and Kundrun, purchased SBT and its U.S. subsidiary, Primetrade USA. SBT's employee, Moreira, told a representative of Plaintiffs CBF and Gusa of the purchase. He explained that SBT was now owned by a much larger, more stable, and more profitable organization, owned and controlled by a very wealthy individual whose assets would stand behind SBT and Primtrade USA. AMCI International explained the purchase in a press release, dated October 5, 2007, as

> an important step in AMCI's overall strategy to diversify into new business segments that complement its existing coal mining and trading activities. AMCI welcomes its new employees and the experienced management teams of SBT and Primetrade [USA] to the AMCI family.

44.     Between January 1, 2008, and September 17, 2008, Plaintiffs and SBT (now owned by the "AMCI Family") entered into the Contracts whereby Plaintiffs would sell a total of 103,500 metric tons of pig iron to SBT for over $76 million.   These Contracts (and one amendment) are attached as Exhibits A-K to the Declaration of Jami Mills Vibbert ("Vibbert Decl."), submitted herewith.

45.     The contracts are as follows:   (1) Contract 8.11.1343 between Plaintiff CBF and SBT, dated January 24, 2008; (2) Contract 8.11.1348 between Plaintiff CBF and SBT, dated January 22, 2008; (3) Contract 8.11.1431 between Plaintiff CBF and SBT, dated June 18, 2008; (4) Contract 8.11.1447 between Plaintiff CBF and SBT, dated September 17, 2008; (5) Contract 8.11.1408-A between Plaintiff Ferguminas and SBT, dated May 16, 2008; (6) Contract 8.11.1408-B between Plaintiff Siderúrgica and SBT, dated May 16, 2008; (7) Contract 8.11.1438-A between Plaintiff Da Terra and SBT, dated July 10, 2008; (8) Contract 8.11.1438-B between Plaintiff Sidepar and SBT, dated July 10, 2008; (9) Contract 8.11.1438-C between Plaintiff Fergumar and SBT, dated July 10, 2008; and (10) Contract 8.11.1438-D between Plaintiff Gusa and SBT, dated July 10, 2008.   Contract 8.11.1408-A had an amendment, Amendment 1 of Contract 8.11.1408-A, dated November 19, 2008.

46.     Each of the Contracts was signed on behalf of SBT by two representatives of SBT, Stephan Herzig ("Herzig"), a Director, and an unknown second representative.

47.     Four of the ten contracts provided for shipment of the pig iron to the United States.   These Contracts provided that the pig iron would be shipped to the Mississippi River, U.S.A.   Shipping confirmations and purchase orders for the pig iron were directed to both SBT and Primetrade USA representatives, including Primetrade USA's President, Walt Stenger, in the United States.

48.     The scheduled time of shipment of the pig iron was from April 2008 through December 1, 2008.

49.     Each of the Contracts contained the following arbitration provision:

> All disputes arising in connection with the present contract shall be finally settled under the rules of Conciliation and Arbitration of the International Chamber of Commerce, Paris, by one or more arbiter, appointed in accordance with said rules.

50.     After entering into the Contracts, Plaintiffs began to produce the pig iron required by the Contracts.

**B.      SBT Breaches the Contracts**

51.     After SBT purchased 33,056 metric tons of pig iron under the Contracts, it stopped purchasing pig iron as required by the Contracts.  By October 2008, SBT was in default of the Contracts.

52.     Plaintiffs contacted SBT and requested SBT fulfill its obligations under the Contracts and take its position regarding contractual performance.  Upon information and belief, SBT and its alter egos and successor-in-interest, through Dominic Sigrist ("Sigrist"), falsely stated their intention regarding contractual performance in an e-mail dated November 20, 2008:

> You know our group and it is not our style to walk away from obligations. . . .  We will need a long time to work this out together.  My message to your group is:  we are not walking away!!!

53.     Despite this false assurance, SBT continued to be in default and did not purchase any further pig iron as required by the Contracts.   Plaintiffs first became aware that this assurance was false when they learned, through publicly available shipping records, that SBT was purchasing pig iron from other suppliers.

54.     On September 11, 2009, Plaintiffs sent notice to SBT regarding the outstanding amounts due and proposing a negotiation prior to submitting the dispute to the ICC Paris arbitration per the Contracts.

55.     SBT requested an extension of time to respond to Plaintiffs' notice, purportedly to assess and evaluate the Contracts and related issues.  Upon information and belief, SBT requested such extension to allow the Corporate and Individual Alter Egos time to engage in a scheme to leave SBT assetless and unable to pay some of its creditors, including Plaintiffs.  The goal of the scheme was to provide SBT with time to dispose of its primary asset, its subsidiary, Primetrade USA.  In addition, SBT made this misrepresentation to permit business operations to proceed under another Mende-and-Kundrun-controlled company, Prime Carbon.

56.     Plaintiffs, unaware of SBT's scheme to defraud them, agreed to extend SBT's time to respond to the notice until October 5, 2009.  SBT responded to the notice on that date, but did not present a settlement proposal and did not indicate its intention to perform the Contracts.

**C.**     **The Arbitration Proceedings and the Fraudulent Transfer of SBT's Assets**

57.     On November 16, 2009, Plaintiffs filed a Request for Arbitration with the ICC Paris.

58.     SBT requested an extension of time to answer the Request for Arbitration until February 15, 2010; the ICC Paris allowed a shorter extension, until January 27, 2010, to answer. Upon information and belief, SBT sought this extension of time to allow Mende and Kundrun, through their alter egos, to complete their scheme to transfer all of SBT's assets to a preexisting shell company owned by Mende and Kundrun, which would insulate SBT's business from Plaintiffs.

59.     On January 11, 2010, Prime Carbon made its first purchase of pig iron.  Given the limited size of the market, Plaintiffs immediately investigated Prime Carbon, as it was a new pig iron purchaser.  At this time, Plaintiffs first suspected that SBT and its alter egos and successor-in-interest were attempting to defraud them.

60.     On January 15, 2010, Plaintiffs sent a letter to the ICC Paris informing it that SBT was transferring its business operations and assets to Prime Carbon and requesting that SBT provide a guarantee in the amount being sought in the arbitration.  Plaintiffs advised the ICC Paris that:  (i) Prime Carbon had the same address as AMCI International (SBT's parent), (ii) Mende (one of the ultimate owners of SBT) was the President of the Board of Directors of Prime Carbon, (iii) former directors of SBT were now directors of Prime Carbon, and (iv) SBT had discontinued its Web site.

61.     On January 25, 2010, SBT responded to Plaintiffs' letter to the ICC Paris.  SBT stated:

> The respondent [SBT] does not try to evade from its obligations. . .
>
> It is true that the website www.steelbasetrade.com was shut down at the beginning of January 2010[.]   The reason is that the Respondent first has to analyze his position regarding pending or imminent claims for damages from purchasers as well as against suppliers as well as his financial situation[.]   Therefore, the Respondent has at least temporarily suspended his business activities.  Please note, however, the Respondent is still existing and has not resolved to be dissolved and liquidated.

62.     Notwithstanding its misrepresentations that it had not resolved to be liquidated and dissolved, SBT did not disclose to the ICC Paris or Plaintiffs that, on December 27, 2009, it had already signed an agreement transferring its business to Prime Carbon ("Transfer Agreement").

63.     SBT also did not disclose to the ICC Paris or Plaintiffs that it had sent letters to various of its pig iron suppliers on January 18, 2010, informing them that:

(i) as of November 30, 2009, SBT had transferred "all Goods and the respective title of the Goods" to Prime Carbon;

(ii) Prime Carbon was "the new and sole owner of the Goods";

(iii) Prime Carbon "assumes all rights with respect to the transferred Goods"; and

(iv) Prime Carbon "is willing to enter in all contracts between your company and [SBT] and to perform under the same conditions."

64.     The letters advised the suppliers "to act from the time being only on instruction of Prime Carbon" and that representatives of Prime Carbon would be contacting the suppliers "within the next few days."  One of these letters is attached to the Vibbert Decl. as Exhibit L.

65.     By these letters, Prime Carbon became SBT's successor-in-interest.  The letters were signed by Herzig (the only remaining Director of SBT) on behalf of SBT.  Herzig would later become a Director of Prime Carbon.

66.     The letters of January 18, 2010, stated that SBT transferred its assets to Prime Carbon on November 30, 2009.  However, the Transfer Agreement transferring all of SBT's assets and liabilities to Prime Carbon was dated almost a month later, December 23, 2009.

67.     Consistent with the scheme not to pay for SBT's breach of the Contracts, Plaintiffs received no communication from Prime Carbon or its purported representatives.

68.     The Transfer Agreement between SBT and Prime Carbon was signed by Herzig, who at the time had sole signatory authority on behalf of SBT, and Thomas Buerger ("Buerger"), who signed on behalf of Prime Carbon.  Buerger was a former Director of SBT and a Director of Prime Carbon and the Chief Financial Officer of AMCI Capital at the time he signed the

Transfer Agreement. Buerger was and is also a Director with signatory authority of AMCI International, SBT's parent. The Transfer Agreement was designated by Prime Carbon and SBT as a "single entity succession," and Prime Carbon became SBT's successor-in-interest through the Transfer Agreement.

69.     The Transfer Agreement transferred $126 million in assets to Prime Carbon for $1, as well as liabilities of $130 million. The assets transferred to Prime Carbon included SBT's main asset, its U.S. subsidiary, Primetrade USA, through a transfer of the 1,000 shares of Primetrade USA's Common Capital Stock on December 27, 2009. Upon information and belief, Mende and Kundrun's scheme to defraud revolved around utilizing their alter egos to transfer the successful ongoing business of Primetrade USA out of reach of the SBT creditors whose liabilities were not assumed by Prime Carbon.

70.     SBT also transferred shares of an Aruba limited liability company, Steel Base Trade A.V.V. ("SBT Aruba"), pursuant to the Transfer Agreement and a blocking certificate dated January 18, 2010.

71.     In order to continue its business, Prime Carbon assumed SBT's bank lines.

72.     SBT also transferred its insurance policies and its physical assets, including cars and computers, to Prime Carbon.

73.     In minutes of Prime Carbon, dated 2009 and unsigned, Mende and Iso Lenzlinger conditionally approved the Transfer Agreement.

74.     On the same day the Transfer Agreement was signed, December 23, 2009, SBT conditionally approved the Transfer Agreement. These minutes, describe, *post hoc*, the "successful efforts" to sell the "healthy" portions of the company. According to SBT in the

January 18, 2010, letters, the "sale" had been accomplished on November 30, 2009, nearly a month before the minutes describing the sales efforts were drafted.

75.    On January 27, 2010, Prime Carbon's and SBT's Supervisory Boards, through Buerger and Herzig, respectively, issued the final approval for the Transfer Agreement. This is the same date that SBT answered the Request for Arbitration before the ICC Paris.

76.    Prime Carbon maintained at least five of the same directors of SBT, including Sigrist, Hans Schneider, Ian Turner, Buerger, and Herzig. Prime Carbon also assumed ten of SBT's employment contracts.

77.    Mende was the President of the Board of Directors of Prime Carbon. Upon information and belief, Prime Carbon was at all times under the control of Mende and Kundrun.

78.    Prime Carbon initially had the same address as SBT, Bahnhof Park 2, 6340 Baar, Switzerland, and then changed its address to be the same as SBT's parent, AMCI International, Seestrasse 17, 6300 Zug, Switzerland. On January 10, 2010, prior to informing the ICC Paris that SBT was still existing and had not determined to be liquidated, SBT transferred its lease contract concerning the Bahnof Park commercial, storage, and parking spaces to Prime Carbon.

79.    Prime Carbon later transferred the shares of Primetrade USA to AMCI Holdings.

80.    Both Prime Carbon and SBT were controlled and/or ultimately owned by Mende and Kundrun. AMCI Holdings, the 100% owner of Primetrade USA's shares, is equally beneficially owned by Mende and Kundrun.

**D.    The Brazilian Court Determines Prime Carbon's Cargo May Be Held to Pay for a Potential Arbitral Award Against SBT in Plaintiffs' Favor**

81.    Plaintiffs discovered, through public shipping documents, that Prime Carbon had loaded 10,000 tons of pig iron on two vessels to depart from the port at Rio de Janeiro, Brazil.

82.     Plaintiffs sought a preliminary order in the Judicial Body of the State of Rio de Janeiro, Second District Court of Rio de Janeiro, ("Second District Court") against SBT and Prime Carbon to prevent the departure from Brazil of the pig iron during the pendency of the ICC Paris arbitration.

83.     On March 22, 2010, the Second District Court awarded the preliminary order requested, finding that:

> "Postponing" the adoption of the measures (requested by the Plaintiffs) can "realistically" cause them a serious, irreparable or hardly reparable damage, also taking into account the "uncertainty" regarding the current economic situation of the Defendants, considering the "fraud" that might have been perpetrated in the case at stake.

84.     SBT and Prime Carbon, acting through the same counsel, appealed the Second District Court's order to the Court of Justice, Thirteenth District Court of Rio de Janeiro ("Appeals Court").   On March 31, 2010, the Appeals Court found that the Second District Court's order should be upheld and that the pig iron cargo should be restrained because:

> [I]t is certain that the Defendants do not provide evidence to 'prove' that they have sufficient 'means' for 'in theory' honoring the mentioned debt (that appears to be 'partly' acknowledged).

85.     Unfortunately, in the week while the appeal was pending, Prime Carbon left port with the pig iron cargo.

## E.     SBT's Bankruptcy

86.     Although SBT had virtually no assets remaining after the Transfer Agreement of December 23, 2009, SBT waited four months, until April 29, 2010, to file for bankruptcy in Switzerland before the Cantonal Court of Zug.

87.     That same day, SBT, through its then-sole director, Herzig, passed a resolution (while in Bangkok, Thailand) providing that SBT would deposit its balance sheet to the bankruptcy judge in Switzerland.

88.     *One day* prior to filing for bankruptcy, SBT transferred 15,000 Swiss francs to Prime Carbon.  Neither SBT's minutes nor Prime Carbon's minutes nor any transfer agreement explain this transfer of money.

89.     On May 5, 2010, SBT notified the ICC Paris of the bankruptcy.

90.     On June 18, 2010, SBT, through its bankruptcy administrator, Andreas Hess ("Hess"), requested a stay of the arbitration proceedings given that SBT was in bankruptcy.  The arbitral tribunal did not rule on the request for a stay.

91.     The request for a stay was renewed on December 15, 2010, and the arbitral tribunal set up a schedule of responses to the stay request.  Plaintiffs objected to the stay and requested the ICC Paris enter an award against SBT.

92.     SBT's bankruptcy administrator, by February 23, 2011, had found that SBT had approximately €7,000 in assets and funds.  This sum was substantially less than its liabilities.

93.     Hess thus determined, on SBT's behalf, that the estate did not have the funds to defend SBT in the arbitration proceedings against it.  SBT's fiduciary made this determination not only because the estate did not have the financial resources to conduct the defense, but also because the estate "d[id] not have any interest in this lawsuit, since the corresponding claim, if the plaintiffs prevail, is collocated only in Class 3 with no expectation of any dividends anyway."

94.     On February 23, 2011, the administrator pursuant to Swiss law asked SBT's creditors if they would like to proceed on SBT's behalf.  Had any of SBT's creditors decided to engage in the arbitration proceedings on SBT's behalf, the bankruptcy administrator would have issued that creditor an "assignment empower[ing] the creditor or creditors in question to pursue the assigned rights or proceedings instead of the bankruptcy estate."

95.     None of SBT's creditors desired to defend SBT in the arbitration against it because it would have been a fruitless endeavor as no assets existed to distribute to creditors.

96.     Given that neither the bankruptcy administrator nor any of SBT's creditors wanted to defend the arbitration on SBT's behalf, the bankruptcy administrator recognized Plaintiffs' arbitration claim against SBT in the bankruptcy proceedings.

97.     On March 29, 2011, the bankruptcy administrator informed the ICC Paris that neither the bankruptcy estate nor any of the creditors by assignment wished to continue the arbitration proceedings against SBT.  The bankruptcy administrator, on SBT's behalf, also at this time admitted the claims against SBT by Plaintiffs in the arbitration, as well as the damages sought by Plaintiffs in the amount of CHF 51,756,269.75.

98.     Plaintiffs' claim against SBT was listed in the inventory of claims for CHF 52,855,844.86.  This claim was not challenged in court, and thus the claim became immediately enforceable by Plaintiffs.

99.     Upon information and belief, on January 24, 2012, the bankruptcy administrator filed its Final Report in SBT's bankruptcy, having determined and listed all assets, made distributions of the €7,000, and inventoried all of SBT's remaining creditors.

**F.     The Award Against SBT**

100.    Following notice that SBT would not be defending in the arbitration proceeding, on or about November 9, 2011, the ICC Paris tribunal rendered its final Award, attached as Exhibit M to the Vibbert Decl., in favor of Plaintiffs for $48,053,462.16 plus interest (at rates detailed in the Award) incurred on this amount from November 20, 2009, until the Award amounts are paid in full.  The Award also awarded Plaintiffs' arbitration costs and legal fees in the amount of $360,000.

101.   Plaintiffs were unable to collect the Award against SBT because all of SBT's assets had been transferred to Prime Carbon.  Plaintiffs sent notices of the Award and payment demands to several companies related to SBT in Europe, Australia, and the United States.  Many of those companies did not reply, and those that did reply denied involvement with SBT.

102.   Upon information and belief, SBT, Mende, Kundrun, and the Corporate Alter Egos were not concerned that Plaintiffs would seek to collect the Award.  Plaintiffs CBF and Gusa told SBT representatives Moreira and Sigrist that Plaintiffs would start an arbitration should SBT fail to perform under the Contracts.  Sigrist responded that Plaintiffs should not waste their time bringing the arbitration and, relaying a comment made by Mende, stated:  "A naked man has no pockets."

## G.   The AMCI Family

103.   Upon information and belief, the business model of Mende and Kundrun, through their alter ego shell and holding companies, is to engage in beneficial transactions, breach unfavorable contracts when the market price changes, and avoid creditors by moving assets away from indebted companies and into new companies.  Upon information and belief, Mende and Kundrun use their network of sham companies to shield themselves from their wrongful acts.

104.   In furtherance of this scheme, Mende and/or Kundrun caused the formation of a number of corporate entities, many of which have been promoted to others in the mining industry as "AMCI" or part of the "AMCI Group" or "AMCI Family."  SBT and each of the Corporate Alter Egos (Primetrade USA, Prime Carbon, AMCI Holdings, AMCI, and K-M) are part of the AMCI Family.  Under the direction of Mende and/or Kundrun, the AMCI Family holds itself out as and is operated as one entity.

105.   Upon information and belief, the relevant U.S. AMCI Family corporate ownership structure is as follows:



106.   Mende and Kundrun each own 50% of AMCI Holdings, which in turn owns Primetrade USA and K-M, and K-M owns AMCI.  Thus, Mende and Kundrun are the common owners of all of the relevant U.S. Corporate Alter Egos.

107.   Upon information and belief, the relevant European AMCI Family corporate ownership structure is as follows:



108.   Upon information and belief, as depicted above, Mende and Kundrun each own 50% of AMCI Worldwide Ltd., which in turn owns AMCI Worldwide Holdings S.a.r.l, which in turn owns AMCI Euro-Holdings B.V., which in turn owns Prime Carbon and AMCI International, which used to own SBT.  Mende and Kundrun are the common owners of the relevant European AMCI Family Corporate Alter Egos and SBT.

109.   Upon information and belief, all of the Corporate Alter Egos are, and SBT was, financially dependent upon Mende and Kundrun.

110.     Upon information and belief, Mende and Kundrun own and/or control and are the alter egos of all of the companies in the AMCI Family, either in their individual capacities or through corporate entities they dominate and control.

111.     Upon information and belief, SBT and the Corporate Alter Egos all have overlapping employees and/or corporate officers and disregard corporate formalities.

112.     Mende is the President and a Director of AMCI Holdings, the President of K-M, President of AMCI, and was the President of the Board of Directors and is now the President of the Management of Prime Carbon.

113.     Kundrun is the Director of AMCI Holdings, the Chairman of the Board of Directors of AMCI, and the Chief Executive Officer of K-M.

114.     Prime Carbon had at least five of the same Directors as SBT, including Herzig, Buerger, Sigrist, Ian Turner, and Hans Schneider.

115.     Buerger, who signed the agreement transferring SBT's assets and some liabilities to Prime Carbon as Director of Prime Carbon, is a Director with signatory authority of SBT's former parent, AMCI International.  Thus, at the time the Transfer Agreement was entered into, Buerger had signatory authority on both sides of the transfer:  for SBT's parent on one side and for Prime Carbon on the other.

116.     Shipping confirmations and purchase orders for contracts with SBT were sent to SBT and Primetrade USA.

117.   Upon information and belief, several of the companies in the U.S. AMCI Family share the same office space as follows:

| 1105 North Market Street, Suite 1300, Wilmington, Delaware 19890 | 475 Steamboat Road, Second Floor, Greenwich, Connecticut 06830 |
|---|---|
| AMCI Holdings | K-M |
| AMCI Acquisition III, LLC | AMCI |
| AMCI Acquisition IV, LLC | AMCI Capital LP |
| AMCI Acquisition V, LLC | AMCI Minerals Corporation |
| AMCI Capital LLC | AMCI Resources Inc. |
| | Day Med Properties, Inc. |
| | Interlaken Capital Inc. |
| | Kirmar Investment Incorporated |
| | Kirmar Limited Partnership |

118.   Upon information and belief, the Delaware address does not have any office space and the above-listed entities do not conduct business elsewhere, except through their alter egos, Mende and Kundrun.

119.   Upon information and belief, the Connecticut address does not contain separate office space or employees for the above-listed entities.

120.   Upon information and belief, Prime Carbon initially shared an address with SBT and then shared an address with SBT's parent, AMCI International.

121.   Upon information and belief, SBT was undercapitalized.   SBT's annual audit reports, issued on December 31, 2007, and December 31, 2008, indicated that SBT was undercapitalized.   SBT's General Assembly did not convene within six months after conclusion of either of those business years to verify the audit reports, in violation of Swiss corporate law.

122.   Upon information and belief, SBT did not observe proper corporate formalities and regularly did not timely approve meeting minutes or even hold meetings.

123.    According to Primetrade USA's Web site, it sources quality pig iron, alloy products, and other materials from locations throughout the world, controlling between 40% and 50% of the pig iron market in the United States.  Primetrade USA's Web site states that its "primary concentration is on pig iron & HBI, to the foundry and steel industry" and "through its affiliated international companies, is able to source these quality materials from South America, South Africa, Ukraine and Russia and is continuously looking for new quality sources."

124.    Also on Primetrade USA's Web site, its network is nationwide:

> Primetrade's sales staff, which are strategically located throughout the United States, covers the industry from coast to coast and has over 70 years of combined experience in the foundry and steel industry.  With more than 12 warehouse locations throughout the United States, Primetrade Inc., is able to provide superior service and on time delivery.

125.    SBT and Prime Carbon had no business outside of the business of Primetrade USA.  Thus, the parent was financially dependent on the subsidiary.  All of the companies in the AMCI Family are financially dependent on Mende and Kundrun and all profits of SBT and the Corporate Alter Egos flow to Mende and Kundrun.

126.    Upon information and belief, Mende and Kundrun fund companies in the AMCI Family with intracompany transfers.

127.    Companies in the AMCI Family lead customers and contract counterparties to believe they are dealing with a substantial enterprise.  Many of the AMCI Family companies are undercapitalized corporate shells operated and controlled by Mende and/or Kundrun.

128.    Upon information and belief, Mende and Kundrun used SBT and the Corporate Alter Egos to defraud Plaintiffs by placing SBT in liquidation after transferring its more important asset to another entity it controlled, Prime Carbon.

129.    Mende and/or Kundrun own, operate, and/or control SBT and each of the Corporate Alter Egos.  Mende and/or Kundrun dominate and disregard the corporate form of their alter egos and carry out the business of SBT and the Corporate Alter Egos.

130.    Mende and Kundrun are the alter egos of AMCI Holdings, which is the alter ego of Primetrade USA, which is the alter ego of Prime Carbon and SBT.  Prime Carbon is also the successor-in-interest and alter ego of SBT.

## H.    Mende and Kundrun's Pattern and Practice of Defrauding Contractual Partners and Other Wrongdoing

131.    Upon information and belief, Mende and Kundrun have engaged in similar misconduct against other victims.

132.    According to the Complaint in *Adani Exports Limited v. AMCI (Export) Corp., et al.*, No. 05-cv-0304 (W.D. Pa. 2006), the plaintiff, Adani Exports Limited ("Adani") entered into several contracts with defendant AMCI Export Corporation ("AMCI Export").  AMCI Export allegedly did not fulfill its contractual obligations.  Allegedly to avoid paying creditors while continuing to receive the benefits of the revenue generated by AMCI Export's coal-trading business, the defendants in that action, including Mende, Kundrun, AMCI, and K-M, engaged in a scheme to transfer the coal-trading business and assets of AMCI Export to a different entity that had been formed by Mende, Kundrun, and another individual.

133.    In addition, Primetrade USA has been accused of nepotism and anti-competitive behavior in counterclaims brought in *Primetrade, Inc. v. Carbones-IMR USA, Inc.*, No. 12-CVS-18774 (Mecklenburg Cty., Super. Ct. Div. NC).  Specifically, defendant Carbones-IMR USA, Inc., ("Carbones") alleges that employees of Primetrade USA left the company because of nepotism and a lack of opportunity for advancement.  After the employees began their own business, Carbones, Primetrade USA sought to put the new company out of business and

otherwise engaged in unfair competition. For example, Carbones alleges that Primetrade USA filed the lawsuit against Carbones as a sham to force Carbones out of business, told its customers that it would discontinue business with those customers if those customers did business with Carbones, and sold pig iron below market price to force competitors out of business.

134.    Upon information and belief, Mende and Kundrun have engaged in and continue to engage in a pattern of fraudulent behavior as alleged above with respect to Plaintiffs and other victims in which they use shell companies to avoid liabilities against them and their alter ego companies.

## FIRST CLAIM FOR RELIEF

### (Confirmation of the Award Pursuant to 9 U.S.C. § 207 Against SBT)

135.    Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1-122 above as if fully set forth herein.

136.    The United States is a signatory to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), which has been codified at Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201 *et seq.*

137.    The New York Convention applies to this Award, which was issued by the International Chamber of Commerce in Paris, France. France is also a contracting state to the New York Convention.

138.    The Award was obtained pursuant to the Contracts, which were signed writings containing the following arbitration provision agreed to by Plaintiffs and SBT:

> All disputes arising in connection with the present contract shall be finally settled under the rules of Conciliation and Arbitration of the International Chamber of Commerce, Paris, by one or more arbiter, appointed in accordance with said rules.

139.   The Award was issued in favor of Plaintiffs against SBT in the amount of $48,053,462.16, plus interest, as well as arbitration costs and legal fees in the amount of $360,000.

140.   None of the grounds for refusal or deferral of recognition or enforcement of the Award is applicable.

141.   As of the date of this filing, the Award has not been satisfied.

142.   Plaintiffs are entitled to an order confirming the Award in the amount of $48,053,462.16, plus interest (at rates detailed in the Award), incurred on this amount from November 20, 2009, until the Award amounts are paid in full, arbitration costs and legal fees in the amount of $360,000, and such further relief as the Court should deem just and proper.

**WHEREFORE**, Plaintiffs demand judgment as follows:

a.  On Plaintiffs' first claim, Plaintiffs seek an order from this Court confirming the Award against SBT in the amount of $48,053,462.16, plus interest (at rates detailed in the Award), incurred on this amount from November 20, 2009, until the Award amounts are paid in full, arbitration costs and legal fees in the amount of $360,000, and such further relief as the Court should deem just and proper.

Dated: April 29, 2013
New York, New York

FULBRIGHT & JAWORSKI LLP

By: _____
David L. Barrack
James Nespole
Jami Mills Vibbert
David B. Schwartz
666 Fifth Avenue
New York, NY  10103
Tel.: (212) 318-3000
Fax: (212) 318-3400
david.barrack@nortonrosefulbright.com
james.nespole@nortonrosefulbright.com
jami.vibbert@nortonrosefulbright.com
david.schwartz@nortonrosefulbright.com

*Attorneys for Plaintiffs CBF Indústria de Gusa S/A,*
*Da Terra Siderúrgica LTDA, Fergumar – Ferro*
*Gusa do Maranhão LTDA, Ferguminas Siderúrgica*
*LTDA, Gusa Nordeste S/A, Sidepar – Siderúrgica*
*do Pará S/A, and Siderúrgica União S/A*